1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11   DAVID H. KATZ, M.D.,                              CASE NO. 06cv0496 DMS (LSP)

12                                   Plaintiff,     **ORDER GRANTING IN PART**
                                                     **AND DENYING IN PART AVANIR**
13            vs.                                    **PHARMACEUTICALS' MOTION**
                                                     **FOR SUMMARY JUDGMENT**
14   AVANIR PHARMACEUTICALS,
                                                     **[Docket No. 49]**
15                                  Defendant.
16   _____

17   AND RELATED COUNTERCLAIM.
     _____

18          This matter comes before the Court on Avanir Pharmaceuticals' motion for summary

19   judgment. David H. Katz, M.D. and Lee R. Katz have filed an opposition to the motion, and Avanir

20   has filed a reply.  The motion came on for hearing on August 10, 2007.  Jeffrey Thomas, Esq.

21   appeared on behalf of Avanir, and Edward Patrick Swan, Jr., Esq. appeared on behalf of the Katzes.

22   For the reasons set out below, the Court grants in part and denies in part Avanir's motion.

23                                              **I.**

24                                        **BACKGROUND**

25          The present case is the most recent chapter in a history between these parties that dates back

26   to the early 1980s.  At that time, Dr. Katz founded the Medical Biology Institute ("MBI") as a non-

27   profit research organization supported by Federal Government research grants and Dr. Katz's own

28   / / /

funds.  Pursuant to a February 10, 1989 Employee Invention and Confidentiality Agreement, Dr. Katz agreed:

> that every possible invention, whether or not patentable, including methods, organisms, cell lines, compositions of matter, machines, and devices, which I conceive or develop or reduce to practice solely or jointly with others, while employed by MBI, or during the course of my utilization of any MBI research facilities, shall be the sole and absolute property of MBI.

(Declaration of Jeffrey T. Thomas in Supp. of Mot. for Summ. J. ("Thomas Decl."), Ex. F.)  Dr. Katz also agreed to "disclose all such inventions to MBI[.]"  (*Id.*)  Dr. Katz was the Director and CEO of MBI until May 14, 1998, when he resigned pursuant to a request of the Board of Directors.  (Thomas Decl., Ex. M at 1.)

In 1986, MBI hired Dr. Mark Richards as a post-doctoral research fellow to work under the supervision of, and be trained by, Dr. Katz in the field of IgE technology.  IgE antibodies are a defense mechanism employed by the human body to fight invaders such as viruses, bacteria and parasites.  These antibodies stimulate cells in areas of the body such as the skin, lungs and intestinal tract to release powerful chemicals, and may cause a variety of adverse reactions, such as allergies and asthma.

After founding MBI and hiring Dr. Richards, Dr. Katz founded LIDAK Pharmaceuticals, Inc. ("LIDAK") as a for-profit organization that would commercialize technology developed at MBI.[1]  Pursuant to a September 9, 1988 Employment Agreement, Dr. Katz agreed to serve as LIDAK's President and Chief Executive Officer.  (Thomas Decl., Ex. G at 1.)  He also agreed to disclose and assign to LIDAK all inventions he conceived during his employment with the Company.  (*Id.* at 14.)  This Agreement, however, was tempered by an Employee Invention, Assignment, Patent and Confidential Information Agreement, which stated: "If Employee is engaged in research supported jointly by LIDAK and Medical Biology Institute (MBI), then Employee's obligations to disclose and to assign inventions as provided in this Agreement shall be to MBI unless specifically directed otherwise instructed by MBI."  (Thomas Decl., Ex. H at 2.)

In 1995, Jagadish C. Sircar, Ph.D. joined LIDAK as the Director of Chemistry.  (Decl. of Jagadish C. Sircar, Ph.D. in Supp. of Mot. for Summ. J. ("Sircar Decl.") at 2.)  While in this position,

---

[1] LIDAK eventually changed its name to Avanir Pharmaceuticals.

1    Dr. Sircar determined that it would be worthwhile for LIDAK to begin "an IgE related drug

2    development program[,]" and he prepared a memorandum addressing this issue. (*Id.*)  As part of this

3    program, Dr. Sircar purchased a small chemical compound library that LIDAK could use "to screen

4    for potentially therapeutically beneficial small molecule compounds for this program and others."

5    (*Id.*)

6          Once LIDAK obtained the library, Dr. Richards and research technician Shirley Cruz began

7    screening for "compounds that could inhibit IgE synthesis and thus potentially be useful

8    therapeutically to treat asthma or allergy."  (*Id.* at 3.)  "Dr. Richards and Ms. Cruz used a series of

9    assays to screen the compounds, including, initially, a well-known and widely used *in vitro* assay

10   technique and an *ex vivo* assay technique."  (*Id.*)[2]

11         At a meeting held on February 4, 1997, Dr. Richards reported to Dr. Sircar and others,

12   including Dr. Katz, that twelve of the screened compounds "appeared to be suitable small molecule

13   candidates for further research and development."  (*Id.*)  During that meeting, Dr. Katz advised that

14   it might be helpful to test some of these compounds using an additional *in vivo* assay, which Dr.

15   Richards, Ms. Cruz and others proceeded to use.  (*Id.*)  One of these compounds was ultimately

16   selected for pre-clinical studies and development, and became the basis for an Investigational New

17   Drug Application ("IND") with the Federal Food and Drug Administration ("FDA").  (*Id.* at 5.)

18         In March 1998, LIDAK's Board of Directors voted to terminate Dr. Katz.  (*Id.* at 4.)

19   Thereafter, on April 30, 1998, Dr. Katz filed a Complaint against LIDAK in San Diego Superior

20   Court.  (Thomas Decl., Ex. K at 1.)  That Complaint alleged claims for declaratory relief and

21   indemnity.  On October 30, 1998, LIDAK filed a Cross-complaint against Dr. and Mrs. Katz alleging

22   claims for breach of fiduciary duty and specific performance.

23         In April 1998, LIDAK filed a Complaint against MBI in San Diego Superior Court.  (Thomas

24   Decl., Ex. M at 1.)  That dispute was settled on August 27, 1998, when the parties entered into a

25   Settlement Agreement ("the Avanir-MBI Settlement Agreement").  (Thomas Decl., Ex. O.)  Pursuant

26   to that Agreement, MBI agreed to "deliver an Assignment to LIDAK of all right, title, and interest in

27

28         [2] The *in vitro* assay tested the compound's reactivity in a Petri-dish environment, and the *ex vivo* assay was a hybrid test using live animals and a Petri-dish environment.  (Decl. of Mark L. Richards, Ph.D. in Supp. of Mot. for Summ. J. ("Richards Decl.") at 2.)

any IgE technology for which it possesses any property rights of any nature whatsoever by executing the Assignment attached as Exhibit 11." (*Id.* at 6.)  Exhibit 11 states MBI will transfer its intellectual property interests "with respect to, related to or underlying the regulation or modulation of Immunoglobulin E ('IgE') production[.]" (*Id.* at 19.)  MBI also agreed to "remise, release, and forever quitclaim" to Avanir all of its interest in "intellectual property rights . . . with respect to, related to or underlying" United States Patent Application Number 09/074,722 ("the '722 Application").  (*Id.*)

On December 30, 1998, Dr. Katz filed a Complaint against MBI in San Diego Superior Court alleging claims for breach of promissory note, money had and received, account stated, breach of oral contract, quantum meruit, express contractual indemnity, and intentional interference with economic relations.  (Thomas Decl., Ex. M at 3.)  Dr. Katz filed another Complaint against MBI in San Diego Superior Court on July 15, 1999, alleging claims for wrongful termination, recovery of specific personal property and conversion.  These disputes were settled on February 2, 2000, when Dr. Katz entered into a Settlement Agreement with MBI ("the Katz-MBI Settlement Agreement").  (Thomas Decl., Ex. M.)

In the meantime, on February 17, 1999, Dr. Katz filed a patent application that resulted in the issuance of United States Patent Number 6,270,746 ("the '746 Patent").  (Decl. of Dr. David H. Katz, M.D. in Supp. of Opp'n to Mot. for Summ. J., Ex. 23.)  On the day he filed this application, Dr. Katz sent a letter to Avanir's Chairman, George Rutland, wherein he stated he had "sole ownership and an inventor's claim in the IgE technology patent entitled 'Assay for the Identification of IgE Antibody Suppressors." (Decl. of Edward Patrick Swan, Jr. in Supp. of Opp'n to Mot. for Summ. J. ("Swan Decl."), Ex. O at 2.)  The '746 Patent ultimately issued on August 7, 2001, and is entitled, "Assay for the Identification of IgE Antibody Suppressors." (*Id.*)

After filing for the '746 Patent, but before its issuance, the jury returned a verdict in the case between the Katzes and LIDAK.  The verdict awarded LIDAK $9 million, and Dr. Katz $6.7 million. (Thomas Decl., Ex. J.)

On March 23, 2000, after the verdict was entered, the Katzes entered into a Settlement Agreement with Avanir ("the Katz-Avanir Settlement Agreement").  (Thomas Decl., Ex. K.)  That Agreement included an assignment provision, which states:

> Dr. and Mrs. Katz will concurrently execute the assignment attached as Exhibit 'F,' and assign to the Company all right, title and interest each of them have, have ever had, or will ever have in any small molecule composition technology relating to the down regulation of IgE or the 'Control of the IgE Allergic Response' (collectively, 'the IgE Technology'), including (but not limited to) any and all interest in the May 8, 1998, patent application (No 09/074,722 entitled 'Control of the IgE Allergic Response'), the July 19, 1999 International Patent Application (No PCTA/US 999/16311 entitled 'Control of the IgE Allergic Response'), the September 10, 1999, patent application (No 09/394,364 entitled 'Control of the IgE Allergic Response'), any other divisional or continuation patent application (be it a continuation or a continuation in part) and any other international filings pertaining or corresponding to the IgE Technology ('the' or 'those Patent Applications').

(*Id.* at 7.)  Pursuant to the Agreement, Avanir agreed to "recognize[ ] Dr. Katz as an inventor of the IgE small molecule composition technology that is claimed" in the '722 Application and United States Patent Application Number 09/394,364 ("the '364 Application"), among others.  (*Id.* at 10.)  Avanir also agreed it would:

> use its best efforts, as determined in the Company's sole judgment, to prosecute and obtain issuance of letters patent based on those Patent Applications, but the Company, acting in good faith, shall have the right to make all decisions respecting the Patent Applications, without notification or consultation with Dr. or Mrs. Katz, including the right to amend the applications, file continuation applications, license, assign or abandon the Patent Applications.

(*Id.*)

On the same day the Katz-Avanir Settlement Agreement was executed, the Superior Court also issued an Order and Consent Decree.  (*Id.* at 31-35.)  In that Order, the Katzes agreed they would "not undertake any action to challenge or set aside any provision of the Settlement Agreement at any time or any ground."  (*Id.* at 33.)  The Court also "enjoined and restrained" the Katzes from doing so.  (*Id.* at 34.)

On March 7, 2006, Dr. Katz filed the present case against Avanir.  After some initial motions, Dr. Katz filed a First Amended Complaint on July 27, 2006, in which he alleges the following four claims for relief: (1) correction of inventorship of United States Patent Numbers 6,919,366 ("the '366 Patent), 6,911,462 ("the '462 Patent"), 6,759,425 ("the '425 Patent"), 6,369,091 ("the '091 Patent"), 6,303,645 ("the '645 Patent"), and 6,271,390 ("the '390 Patent"), (2) assignment of these same patents, (3) infringement of the '746 Patent, and (4) rescission of the Katz-Avanir Settlement Agreement based on fraudulent inducement.  On August 14, 2006, Avanir filed its Third Amended

Answer and Counterclaims against Dr. and Mrs. Katz. The Counterclaims allege the following claims for relief: (1) a declaratory judgment of non-infringement of the '746 Patent, (2) a declaratory judgment of assignment of the '746 Patent, (3) breach of contract (the Katz-Avanir Settlement Agreement), (4) intentional and fraudulent misrepresentation, and (5) a declaratory judgment of invalidity of the '746 Patent.

Avanir filed the present motion on June 18, 2007. The Katzes filed their opposition on July 23, 2007, and Avanir filed its reply on July 31, 2007.

## II.

## DISCUSSION

Avanir moves for summary judgment on Dr. Katz's second, third and fourth claims for relief, and its first and second counterclaims. Avanir argues it is the owner of the '746 Patent by virtue of the assignment provision of the Katz-Avanir Settlement Agreement, or alternatively, the assignment provision of the Avanir-MBI Settlement Agreement. Assuming it is not the owner of the '746 Patent, Avanir asserts it did not infringe the '746 Patent because its use of the technology was not a meaningful, infringing use. Even if there was an infringing use, Avanir contends that use was protected either by 35 U.S.C. § 271(e)(1) or an implied license to use the technology from Dr. Katz. As for the '390, '645, '091, '425, '462 and '366 Patents, Avanir insists Dr. Katz is not entitled to have those Patents assigned to him because he is not the successor-in-interest to MBI. Finally, Avanir maintains Dr. Katz's rescission claim fails for several reasons. First, Avanir argues the claim seeks only partial rescission of the contract, which is legally improper. Second, Avanir asserts it did not breach the contract. Third, Avanir contends the claim is barred by the statute of limitations, the doctrine of laches, the Order and Consent Decree and the Katz-Avanir Settlement Agreement. Fourth, Avanir declares there is no evidence to support any of the elements of fraudulent inducement. Fifth, Avanir argues Dr. Katz lacks standing to allege a violation of the Bayh-Dole Act.

**A.      Summary Judgment**

"Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1380 (Fed. Cir. 2005) (citing Fed. R. Civ. P. 56(c)). "A material issue of fact is one

1    that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions

2    of the truth."  *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

3            The moving party has the initial burden of demonstrating that summary judgment is proper.

4    *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  To meet this burden, the moving party must

5    identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the

6    absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If

7    the moving party satisfies this initial burden, then the burden shifts to the opposing party to show that

8    summary judgment is not appropriate.  *Id.* at 324.  The opposing party's evidence is to be believed,

9    and all justifiable inferences are to be drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

10   242, 255 (1986).  *See also IPXL*, 430 F.3d at 1380 (quoting *Chiuminatta Concrete Concepts, Inc. v.*

11   *Cardinal Indus.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998)) (stating "'evidence must be viewed in the light

12   most favorable to the party opposing the motion, with doubts resolved in favor of the opponent.'")

13   However, to avoid summary judgment, the opposing party cannot rest solely on conclusory

14   allegations.  *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986).  Instead, it must designate specific

15   facts showing there is a genuine issue for trial.  *Id.*  More than a "metaphysical doubt" is required to

16   establish a genuine issue of material fact."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

17   475 U.S. 574, 586 (1986).

18   **B.    Assignment of the '746 Patent**

19           As mentioned above, Avanir asserts it is the rightful owner of the '746 Patent by virtue of the

20   assignment provisions in the Katz-Avanir Settlement Agreement and the Avanir-MBI Settlement

21   Agreement.  In response, Dr. Katz argues there is a genuine issue of material fact that prevents entry

22   of summary judgment.

23           1.    Katz-Avanir Settlement Agreement

24           The assignment provision of the Katz-Avanir Settlement Agreement is found in Section 1.3,

25   which states:

26           Dr. and Mrs. Katz will concurrently execute the assignment attached as Exhibit 'F,'
             and assign to the Company all right, title and interest each of them have, have ever
27           had, or will ever have in any small molecule composition technology relating to the
             down regulation of IgE or the 'Control of the IgE Allergic Response' (collectively,
28           'the IgE Technology'), including (but not limited to) any and all interest in the May
             8, 1998, patent application (No 09/074,722 entitled 'Control of the IgE Allergic

- 7 -                                                            06cv0496

1   Response'), the July 19, 1999 International Patent Application (No PCTA/US
    999/16311 entitled 'Control of the IgE Allergic Response'), the September 10, 1999,
2   patent application (No 09/394,364 entitled 'Control of the IgE Allergic Response'),
    any other divisional or continuation patent application (be it a continuation or a
3   continuation in part) and any other international filings pertaining or corresponding to
    the IgE Technology ('the' or 'those Patent Applications').
4

5   (Thomas Decl., Ex. K.)  There is no dispute the '746 Patent is not specifically identified in this

6   provision or elsewhere in the Settlement Agreement.  Rather, the parties dispute whether the '746

7   Patent concerns "IgE Technology," as that term is defined in the Settlement Agreement.  Avanir

8   asserts it does, while Dr.  Katz asserts it does not.

9       It is apparent from these arguments that there is a genuine issue of material fact concerning

10  the scope of the assignment provision in the Katz-Avanir Settlement Agreement.  Although "IgE

11  Technology" is defined in the Settlement Agreement, the parties are interpreting the phrase differently

12  to reach different conclusions about whether the '746 Patent falls within the definition.  Avanir argues

13  "IgE Technology" includes the assay disclosed in the '746 Patent, whereas Dr. Katz asserts "IgE

14  Technology" covers only the composition technology, not the assay.  In support of his interpretation

15  of the Agreement, Dr. Katz argues Avanir had notice of the application leading to '746 Patent at the

16  time the Agreement was executed, and thus its omission from the Agreement is evidence that it was

17  not included in the assignment.

18      Because it is unclear whether the assignment provision includes the '746 Patent, this issue is

19  inappropriate for resolution on a motion for summary judgment.  *See Beck Park Apartments v. United*

20  *States Dep't of Housing and Urban Development*, 695 F.2d 366, 369 (9th Cir. 1982) (citing *United*

21  *States v. Sacramento Municipal Utility Dist.*, 652 F.2d 1341, 1344 (9th Cir. 1981)) (stating summary

22  judgment is inappropriate if contract is unclear).

23      2.    Avanir-MBI Settlement Agreement

24      Alternatively, Avanir argues it is the rightful owner of the '746 Patent by virtue of the Avanir-

25  MBI Settlement Agreement.  Section 5.2 of this Agreement states: "Upon Court approval of this

26  Agreement, the Institute will deliver an Assignment to LIDAK of all right, title and interest in any IgE

27  technology for which it possesses any property rights of any nature whatsoever by executing the

28  Assignment attached as Exhibit 11." (Thomas Decl., Ex. O.)  Exhibit 11 then states MBI will transfer

1  its intellectual property interests "with respect to, related to or underlying the regulation or modulation

2  of Immunoglobulin E ('IgE') production[.]"  (*Id.*)  As with the Katz-Avanir Settlement Agreement,

3  the '746 Patent is not specifically mentioned in this Agreement, and the parties dispute whether the

4  general language encompasses the '746 Patent.

5  Avanir argues Dr. Katz admitted he developed the assay while he was employed by MBI and

6  Avanir, and thus, according to his employment agreements with these entities and his testimony, MBI

7  was the rightful owner of the '746 Patent.  Assuming MBI was the rightful owner, Avanir asserts it

8  transferred its interests in the assay to Avanir in the Avanir-MBI Settlement Agreement.

9  In response, Dr. Katz argues the application leading to the '746 Patent was filed after Dr. Katz

10  resigned from MBI and after the Avanir-MBI Settlement Agreement was executed, therefore it is not

11  covered either by Dr. Katz's employment agreements with MBI or the Avanir-MBI Settlement

12  Agreement.  However, whether Dr. Katz was employed by MBI at the time he conceived the invention

13  disclosed in the '746 Patent is subject to question.  According to his Settlement Agreement with MBI,

14  Dr. Katz resigned as Director and CEO of MBI on May 14, 1998, but he did not resign from the

15  scientific faculty at that time.  Indeed, it is unclear exactly when Dr. Katz resigned as a member of the

16  scientific faculty of MBI.   In light of this material question of fact, summary judgment is

17  inappropriate. In addition, even if Dr. Katz was employed as a member of the scientific faculty of MBI

18  when he conceived the invention disclosed in the '746 Patent, and the invention was the property of

19  MBI, it is unclear, as with the Katz-Avanir Settlement Agreement, whether the assignment provision

20  in the Avanir-MBI Settlement Agreement includes the '746 Patent.  Accordingly, it is inappropriate

21  for the Court to decide this issue on a motion for summary judgment.  *See Beck Park*, 695 F.2d at 369

22  (citing *Sacramento Municipal Utility Dist.*, 652 F.2d at 1344).

23  **C.     Non-Infringement of the '746 Patent**

24  Next, Avanir argues it is entitled to summary judgment of non-infringement of the '746 Patent.

25  Avanir asserts it did not engage in any meaningful infringing use of the invention, and even if it did,

26  that use was protected either by 35 U.S.C. § 271(e)(1) or an implied license from Dr. Katz.

27  1.     35 U.S.C. § 271(e)(1)

28  Title 35 United States Code section 271(e)(1) states:

It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

35 U.S.C. § 271(e)(1).  In a recent decision, the Supreme Court interpreted this safe harbor provision broadly, stating, "the statutory test makes clear that it provides a wide berth for the use of patented drugs in activities related to the federal regulatory process." *Merck KGAA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 202 (2005).  These activities could include "preclinical studies of patented compounds that are appropriate for submission to the FDA in the regulatory process." *Id.*  The studies would only be protected, however, "as long as there is a reasonable basis for believing that the experiments will produce 'the types of information that are relevant to an IND or NDA.'" *Id.* at 208.

Here, Avanir asserts that its use of the assay disclosed in the '746 Patent was "directly related to Avanir's efforts to develop a drug candidate that could form the subject of a submission to the FDA." (Mem. of P. & A. in Supp. of Mot. for Summ. J. at 13.)  Avanir provides evidence to support this assertion, including the Declarations of Mark L. Richards, Ph.D. and Jagadish C. Sircar, Ph.D., and the deposition testimony of Dr. Katz.  Dr. Sircar states he prepared a memorandum regarding a drug development program related to IgE technology in April 1996, when he was the Director of Chemistry at Avanir.  (Sircar Decl. at 2.)  Thereafter, Dr. Richards and a research technician began using the '746 assay to screen compounds as part of the IgE drug development program.  (Richards Decl. at 2.) Eventually, Avanir selected one compound from this program for "pre-clinical studies and development," and the compound ultimately formed the basis of an IND with the FDA.  (Sircar Decl. at 5.)

Faced with this evidence and Dr. Katz's admission that Avanir's IgE-related research was "certainly pertinent" to the discovery of "a drug that could be proposed to the FDA, go through clinical trials, hopefully be approved[,]" (Thomas Decl., Ex. A at 53-54), the Katzes attempt to raise a genuine issue of material fact by citing to Dr. Richards' deposition testimony.  However, the selected portions of his testimony do not meet that standard.  Indeed, they fail to address Avanir's use of the '746 assay in the IgE drug development program.

At oral argument, the Katzes raised a new argument on the issue of Section 271(e)(1): That it does not apply to this case because the '746 Patent claims a research tool rather than a patented compound. In support of this argument, they cite *Integra Lifesciences I, Ltd. v. Merck KgaA*, ___ F.3d ___, Nos. 2002-1052, 2002, 1065, 2007 WL 2142878 (Fed. Cir. July 27, 2007). Although the dissent supports the Katzes' argument, the majority opinion does not. Indeed, the court explicitly stated it was not reaching this issue. *Id.* at *13. *See also Merck*, 545 U.S. at 205 n.7 (declining to reach issue of whether research tools fall within Section 271(e)(1)). Thus, there is currently no legal authority that supports the Katzes' "research tools" argument. On the contrary, the statute itself exempts the use of "patented invention[s]," and the Supreme Court has given the statute a broad interpretation. *See id.* at 202.

Based on the evidence presently before the Court, the Katzes have failed to raise a genuine issue of material fact about whether Avanir's use of the '746 assay was "reasonably related" to its IgE drug development program and the IND that was eventually submitted to the FDA. Avanir's evidence supports a finding that its use of the '746 assay was "reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs[,]" and thus Avanir is entitled to summary judgment of non-infringement pursuant to the safe harbor provision of Section 271(e)(1).

2.     Implied License

In addition to arguing its conduct is protected by Section 271(e)(1), Avanir asserts it is entitled to summary judgment of non-infringement based on an implied license from Dr. Katz. An implied license "is a complete defense to a claim of patent infringement." *Travelers Express Co., Inc. v. American Express Integrated Payment Systems, Inc.*, 80 F.Supp.2d 1033, 1038 (D. Minn. 1999) (citing *Carborundum Co. v. Molten Metal Equipment Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995)). As the alleged infringer, Avanir "has the burden of establishing the existence of an implied license as an affirmative defense." *Id.* (citing *Carborundum*, 72 F.3d at 877).

An implied license to patented technology may "arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel." *Wang Labs., Inc., v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997). In this case, Avanir appears to rely

1   on the theory that Dr. Katz's conduct created an implied license to use the '746 Patent.  This theory

2   is closely related

3   / / /

4   to that of equitable estoppel, but unlike equitable estoppel, which "focuses on 'misleading' conduct

5   suggesting that the patentee will not enforce patent rights[,]" an implied license based on conduct

6   "looks for an affirmative grant of consent or permission to make, use, or sell: *i.e.*, a license."  *Id.* at

7   1581.[3]

8          Here, Avanir presents undisputed evidence that in 1997, Dr. Katz advised certain employees

9   of MBI and LIDAK that it might be helpful to test the chemical compounds using the *in vivo* assay

10  that was subsequently claimed in the '746 Patent.  (Sircar Decl. at 2.)  Pursuant to that advice, the

11  employees began using the *in vivo* assay, and informed Dr. Katz that they were doing so.  (Richards

12  Decl. at 3.)  Despite this knowledge, Dr. Katz failed to inform these employees that he intended to

13  claim this assay as his own in a patent application, nor did he direct the employees to stop using the

14  assay.  (*Id.*)  In light of this undisputed conduct, and the employment relationships then in effect

15  between Dr. Katz, MBI and LIDAK, the Court finds Avanir did have an implied license to the '746

16  Patent.  Accordingly, Avanir is entitled to summary judgment of non-infringement on this ground, as

17  well.[4]

18  **D.      Rescission of the Katz-Avanir Settlement Agreement**

19

20

21  _____

22          [3]  The Katzes assert that an implied license requires a showing that the patentee received
    "valuable consideration" in exchange for the right to use the patented technology.  (Mem. of P. & A.

23  in Opp'n to Mot. for Summ. J. at 15.)  Although that fact may be relevant to determining whether the
    patentee's conduct created an implied license, *see Wang*, 103 F.3d at 1582, it does not appear to be

24  a "necessary" element of the defense. *See Travelers Express*, 80 F.Supp.2d at 1038 (stating elements
    of license by estoppel are: 1) infringement by defendant, 2) patentee's knowledge thereof, 3) conduct

25  by patentee that induced infringer to believe patentee acquiesced in infringement, and 4) infringer's
    reliance thereon).  Even if it were, however, there is no dispute that Dr. Katz received a salary and

26  benefits from MBI and/or LIDAK when he allegedly granted them an implied license to his
    technology.

27          [4]  Because the Court finds Avanir is entitled to summary judgment of non-infringement

28  pursuant to Section 271(e)(1) and an implied license from Dr. Katz, it does not address Avanir's
    alternative argument that it did not engage in any meaningful infringing use of the patented
    technology.

1    The next issue before the Court is whether Avanir is entitled to summary judgment on Dr.

2    Katz's claim for rescission of the Katz-Avanir Settlement Agreement based on fraudulent

3    inducement.[5]  Avanir raises several arguments on this claim, which the Court addresses below.

4         Avanir's first argument is this claim is barred by the Order and Consent Decree issued by the

5    Superior Court.  (*See* Thomas Decl., Ex. L.)  Pursuant to this Order, the Katzes agreed they would "not

6    undertake any action to challenge or set aside any provision of the Settlement Agreement at any time

7    or on any ground."  (*Id.* at 3.)  Indeed, the Superior Court specifically "enjoined and restrained" the

8    Katzes from doing so in the Order.  (*Id.* at 4.)

9         Notwithstanding this broad language, the Katzes assert the Order does not bar their claim

10   because it allows a party to the Settlement Agreement to seek relief for the other party's breach.  (*Id.*)

11   In this case, however, Dr. Katz is not alleging a claim for breach of the Settlement Agreement.

12   Rather, he is seeking to rescind or "set aside" the Settlement Agreement based on fraud.  This, he is

13   enjoined and restrained from doing according to the clear language of the Order and Consent Decree.

14        Dr. Katz attempts to avoid this result by relying on the Superior Court's refusal to adjudicate

15   the issue of inventorship, and Avanir's submission to the jurisdiction of this Court, but neither of these

16   arguments is on point.  The Superior Court's understanding of its ability to correct inventorship of a

17   patent says nothing about the preclusive effect of the Order and Consent Decree, but rather speaks to

18   this Court's exclusive jurisdiction to adjudicate patent matters.  The same may be said of Avanir's

19   submission to this Court's jurisdiction.

20        Dr. Katz's two additional arguments, which he raised at oral argument, are equally unavailing.

21   His first argument is that a party to a contract cannot waive a claim of fraudulent inducement

22   notwithstanding the broad language in the Order and Consent Decree that enjoins and restrains the

23   Katzes from seeking to challenge or set aside the Settlement Agreement "at any time or on any

24   ground.[,]" (*id.*), and Section 4.5 of the Settlement Agreement itself in which the parties "assume[d]

25

26

_____

27        [5]  Although Avanir has not raised the issue in the present motion or on a motion to dismiss,
     there is some concern that Dr. Katz has not satisfied the heightened pleading requirements of Rule
28   9(b) for this claim.  *See Smith v. Allstate Ins. Co.*, 160 F.Supp.2d 1150 (S.D. Cal. 2001) (holding state
     law claim for promissory fraud must comply with Rule 9(b)'s pleading requirements).

the risk of any misrepresentation, concealment or mistake." (Thomas Decl., Ex. K at 15.)[6]  Although

California law frowns upon contracts that exempt anyone for their own fraud, *see* Cal. Civ. Code §

1668, this statute "'does not apply to every contract.'" *Madison v. Superior Court*, 203 Cal. App. 3d

589, 598 (1988) (quoting *Vilner v. Crocker National Bank*, 89 Cal. App. 3d 732, 735 (1979)).  Indeed,

the statute only applies "to contracts that involve 'the public interest.'" *Id.* (quoting *Cregg v. Ministor*

*Ventures*, 148 Cal. App. 3d 1107, 111 (1983)) (quotations omitted).  Dr. Katz has not shown, and the

record does not reflect, that the Order and Consent Decree is such a contract.  *See id.* at 598-99 (listing

characteristics of public interest contracts).

Dr. Katz's second argument is that the Order and Consent Decree is ambiguous in light of

information Dr. Katz received from Judge Strauss during a private meeting in Judge Strauss'

chambers.  (*See* Supp. Decl. of Edward Patrick Swan, Jr. in Supp. of Opp'n to Mot. for Summ. J., Ex.

U.)  However, the Court disagrees that the Order and Consent Decree is ambiguous.  On the contrary,

the Order clearly states the Katzes will not "challenge or set aside . . . the Settlement Agreement at

any time or on any ground."  (Thomas Decl., Ex. K at 33.)  In light of this broad language, other

provisions in the Consent Decree contemplate the remedy of breach of contract, but not rescission.

(*Id.* at 34.)  Because the Order and Consent Decree is not ambiguous, the parol evidence offered by

Dr. Katz is not admissible to vary its terms, which clearly bar the present claim.  *See Wagner v.*

*Columbia Pictures Industries, Inc.*, 146 Cal. App. 4th 586, 589-90 (2007) (quoting *Pacific Gas &*

*Electric Co. v. G.W. Thomas Drayage Etc. Co.*, 69 Cal. 2d 33, 37 (1968)) ("when a party contends the

language of a contract is ambiguous the test for admissibility of extrinsic evidence to explain the

meaning of a contract is not whether the contract appears to the court to need interpreting 'but

whether the offered evidence is relevant to prove a meaning to which the language of the instrument

---

[6]  Section 4.5 goes on to state: "If any Party should subsequently discover that any fact relied upon by he, she or it in entering into this Agreement was untrue, or that any fact was concealed from it, or that its understanding of the facts or of the law was incorrect, such Party shall not be entitled to any relief, including, without limitation on the generality of the foregoing, any alleged right or claim to set aside or rescind this Agreement."  (*Id.*)  These terms, and all others in the Settlement Agreement, were specifically adopted and incorporated by the Court in the Order and Consent Decree.  (Thomas Decl., Ex. L at 1.)

1   is reasonably susceptible.'")  Accordingly, Avanir is entitled to summary judgment on Dr. Katz's

2   claim for rescission of the Settlement Agreement based on fraudulent inducement.[7]

3   **E.      Assignment of the '390, '645, '091, '366, '425 and '462 Patents**

4          The final claim at issue in this motion is Dr. Katz's claim for assignment of the above-

5   mentioned patents. Dr. Katz alleges he is entitled to assignment of these patents based on (1) Avanir's

6   breach of the Katz-Avanir Settlement Agreement, and (2) Dr. Katz's status as MBI's successor-in-

7   interest. For the reasons set out in Section II.D. above, the Court finds Avanir is entitled to summary

8   adjudication in its favor on the first basis for this claim.[8]  The second basis is discussed below.

9          Avanir argues Dr. Katz is not the successor-in-interest to MBI because MBI assigned its

10  interest in these patents to Avanir pursuant to the Avanir-MBI Settlement Agreement. As mentioned

11  above, Section 5.2 of this Agreement states: "Upon Court approval of this Agreement, the Institute

12  will deliver an Assignment to LIDAK of all right, title and interest in any IgE technology for which

13  it possesses any property rights of any nature whatsoever by executing the Assignment attached as

14  Exhibit 11." (Thomas Decl., Ex. O at 6.)  In Exhibit 11, MBI agreed to "remise, release, and forever

15  quitclaim" to Avanir "any equitable or legal right, title, and interest" it had "with respect to, related

16  to or underlying U.S. Patent Application No. 09/074,722" and "any intellectual property that is related

17  to or underlying the regulation or modulation of IgE production, including any such property rights

18  or inventions covered by those patent applications." (*Id.* at 19.)  There is no dispute that the '390,

19  '645, '091, '366, '425 and '462 Patents disclose and claim the same subject matter as the '722

20  Application. (*See* Mem. of P. & A. in Opp'n to Mot. for Summ. J. at 3.)  Thus, these Patents were

21  subject to the Avanir-MBI Settlement Agreement, and they were properly assigned to Avanir.

22

23          [7]  Because the Court finds the Order and Consent Decree bars the Katzes' claim, it does not address Avanir's alternative arguments concerning timeliness, partial rescission, whether there is evidence to support the elements of the claim, and whether the claim is barred by the Settlement

24  Agreement itself.

25          [8]  The Court notes this claim is distinguishable from Dr. Katz's fraudulent inducement claim in that it alleges an actual breach of contract, which is permitted under the Order and Consent Decree,

26  whereas the fraudulent inducement claim is not. However, Dr. Katz does not seek damages or specific performance as a result of Avanir's alleged breach. Specific performance would only require Avanir

27  to recognize Dr. Katz as an inventor of these Patents, which is not what he seeks by this claim. Rather, Dr. Katz seeks assignment of the Patents from Avanir to himself. This remedy would only

28  be available if the Settlement Agreement were set aside, but as set out above, this remedy is clearly foreclosed by the Order and Consent Decree.

1    Assuming, however, these Patents were not included in the Avanir-MBI Settlement
2    Agreement, and thus, they remained the property of MBI, Dr. Katz has failed to come forward with
3    any evidence to support his claim that he is a successor-in-interest to MBI.  The only evidence he
4    relies on to support this claim is an alleged monetary debt owed to him by MBI.  (*See id.* at 11.)  Yet,
5    he fails to cite any legal authority that one's status as a creditor is sufficient to show one is a
6    successor-in-interest to another's intellectual property rights.  Accordingly, Avanir is entitled to
7    summary judgment on Dr. Katz's claim for assignment of the '390, '645, '091, '366, '425 and '462
8    Patents.
9    / / /

10                                          **III.**

11                              **CONCLUSION AND ORDER**

12    For all the foregoing reasons, the Court grants in part and denies in part Avanir's motion for
13    summary judgment.  Specifically, the Court grants the motion as to Dr. Katz's claims for assignment
14    of the '390, '645, '091, '366, '425 and '462 Patents, infringement of the '746 Patent and rescission
15    of the Katz-Avanir Settlement Agreement, and Avanir's counterclaim for a declaratory judgment of
16    non-infringement of the '746 Patent.  Avanir's motion is denied as to Avanir's counterclaim for a
17    declaratory judgment of assignment of the '746 Patent.

18        **IT IS SO ORDERED**.

19    DATED:  August 21, 2007

20    _____

21                                          HON. DANA M. SABRAW
                                            United States District Judge
22

23

24

25

26

27

28